**LITE DEPALMA & GREENBERG, LLC**
Joseph J. DePalma
Bruce D. Greenberg
570 Broad Street - Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Email: jdepalma@litedepalma.com
        bgreenberg@litedepalma.com

*Attorneys for Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees'*
*Benefit Fund*
[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TEAMSTERS LOCAL 237 WELFARE FUND and TEAMSTERS LOCAL 237 RETIREES' BENEFIT FUND, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMGEN INC., WATSON LABORATORIES, INC., WATSON PHARMACEUTICALS, INC., ACTAVIS PLC, ACTAVIS PHARMA, INC., TEVA PHARMACEUTICALS INDUSTRIES LTD., and TEVA PHARMACEUTICALS USA, INC.<br><br>Defendants. | Civil Action No. _____<br><br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund (collectively "Local 237"), on behalf of themselves and all others similarly situated, bring this antitrust class action against Defendants Amgen Inc., Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Actavis plc, Actavis Pharma, Inc., Teva Pharmaceuticals Industries Ltd.,

and Teva Pharmaceuticals USA, Inc. (collectively "Defendants") based on personal knowledge as to itself and upon information and belief as to all other allegations, and alleges as follows.

## I.  INTRODUCTION

1.  Plaintiffs bring this antitrust action on behalf of a proposed class of end-payors who indirectly purchased, reimbursed, or otherwise paid for Sensipar (cinacalcet hydrochloride tablets) or its AB-rated generic equivalent. Sensipar is a drug used to treat certain conditions associated with chronic kidney disease and thyroid cancer. Defendants have engaged in anticompetitive conduct that has prevented a less expensive generic equivalent of Sensipar from entering the market, in violation of federal and state law. Plaintiffs seeks damages, an order enjoining defendants' anticompetitive conduct, and other appropriate relief.

2.  Amgen received FDA approval for Sensipar in March 2004. Sensipar's sales grew rapidly such that as of 2017, Amgen's United States sales were over $1 billion in sales in 2017 and were at or near $1 billion in the first three quarters of 2018.

3.  One of Amgen's patents for Sensipar, U.S. Patent No. 6,011,068 (the "'068 Patent"), was set to expire on March 8, 2018.  This patent, stating claims related to calcimimetic compounds – was the primary patent setting forth the chemical composition of Sensipar.

Because Sensipar was a blockbuster drug, numerous generic manufacturers filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking the approval of generic versions of Sensipar. Teva was one such generic. Other generic manufacturers filing ANDAs included Accord Healthcare and Intas Pharmaceuticals ("Accord"); Ajanta Pharma, Ltd. and Ajanta Pharma USA, Inc. ("Ajanta"); Alkem Laboratories Ltd ("Alkem"); Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals of New York, LLC and Amneal Pharmaceuticals Co. India Private Ltd. ("Amneal"); Apotex Inc. and Apotex Corp. ("Apotex"); Aurobindo Pharma Ltd. and Aurobindo Pharma USA Inc. ("Aurobindo"); Breckenridge Pharmaceutical, Inc. ("Breckinridge"); Cipla

Limited and Cipla USA, Inc. ("Cipla"); Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Emcure Pharmaceuticals Ltd. ("Emcure"); Heritage Pharmaceuticals Inc. and Heritage Pharma Labs, Inc. ("Heritage"); Hetero USA Inc., Hetero Labs Ltd. and Hetero Labs Ltd. Unit V ("Hetero"); Lupin Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"); Macleods Pharmaceuticals Ltd., Macleods, and Macleods Pharma USA Inc. ("McLeods"); Micro Labs Ltd. and Micro Labs USA Inc. ("Micro Labs"); Mylan Pharmaceuticals, Inc. and Mylan, Inc.; Piramal Healthcare UK Ltd. "Mylan"); Strides Pharma Global PTE Ltd. and Strides Pharma, Inc. ("Strides"); Sun Pharma Global FZE and Sun Pharmaceutical Industries, Inc. ("Sun Pharma"); Teva Pharmaceuticals, USA, Inc. and Barr Pharmaceuticals; Watson Laboratories, Inc., Actavis, Inc., and Actavis Pharma, Inc.; Torrent Pharmaceuticals Ltd.; and Zydus Pharmaceuticals (USA).

4.    Between March 8, 2018 and December 27, 2018, the FDA approved ANDAs from Cipla, Aurobindo, Strides Pharma Global, Piramal Healthcare, Sun Pharma, Mylan, and Teva.

5.    As part of their applications, these generic manufacturers were required to make certain certifications against the patents covering Sensipar. Among these patents was U.S. Patent No. 9,375,405 ("the '405 patent"), "Rapid dissolution formulation of a calcium receptor-active compound." Unlike the '086 patent, the '405 Patent was a formulation patent, which only covered a new formulation of the existing cinacalcet hydrochloride compound.

6.    Generic manufacturers filed "Paragraph IV" certifications against the '405 patent, claiming that the patent was invalid, unenforceable, and/or not infringed by the proposed ANDA applicants' generics.

7.    In connection with the ANDAs, Amgen sued each generic manufacturer that filed an ANDA for allegedly infringing the '405 patent. Many of the generics manufacturers thereafter

settled with Amgen, including Strides Pharma, Apotex Corp., Micro Labs, Breckenridge Pharmaceutical, Sun Pharmaceutical, Hetero Labs, Ajanta Pharma, Cipla Ltd., Mylan Pharmaceuticals, Dr. Reddy's Laboratories, Aurobindo Pharma, Macleods Pharma, Lupin Pharmaceuticals, Alkem Laboratories, Torrent Pharma, Heritage, and Emcure.

8.     However, several generic manufacturers, including Teva, Amneal, Piramal, and Zydus, took these claims to a bench trial in the District of Delaware, before Judge Mitchell Goldberg,[1] in March 2018. After the submission of post-trial briefs, in July 2018, the court issued an opinion, finding that Teva, Amneal, and Piramal's generic versions of Sensipar did not infringe the '405 patent. In September 2018, Amgen filed a notice of appeal to the Federal Circuit.

9.     While this appeal was pending, on December 27, 2018, the FDA approved Teva's ANDA for a generic version of Sensipar. Teva immediately launched its generic product. During the one week that followed, Teva flooded the market with roughly six weeks of product sales. In that shore time, Teva reportedly made $59 million in profits (assuming at 25% discount off Sensipar's price), while Amgen lost an estimated $79 million in profits.

10.     Despite Teva's tremendous profits, on January 2, 2019, after only one week of availability of generic Sensipar, Teva and Amgen entered a confidential agreement in which Teva agreed to stop selling its generic version of Sensipar.

11.     This deal re-established and maintained Amgen's brand monopoly. Moreover, the deal eliminated not only Teva as a competitor, but it prevented other generic entrants well. Amgen's '405 patent action settlements apparently included acceleration clauses, which permit the generics to enter the market after a short delay if another generic, like Teva, launched. The

---

[1]     Judge Goldberg presides in the Eastern District of Pennsylvania, who presided over the patent litigation in the District of Delaware as a visiting judge.

hasty deal between Amgen and Teva served as a bottleneck to avoid triggering the acceleration clauses, thereby preventing other settling generics from launching their products. Amgen and Teva thus stopped other generics from entering and driving the price of Sensipar well below Teva's discount.

12.     Harm to Plaintiffs and the Class is ongoing, as there still is no generic alternative to Amgen's branded Sensipar available to purchase.

## II.     PARTIES

13.     Plaintiffs are Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund (collectively "Local 237"). Local 237 consists of two health and welfare benefit plans and is headquartered and with a principal place of business in New, York, New York. Local 237 administers the assets of defined contribution plans formed to provide certain benefits including prescription drug benefits. Local 237 provides health and welfare benefits to active and retired members and participants who reside in numerous locations in the United States. During the Class Period, Local 237 indirectly purchased, paid, or reimbursed for some or all of the purchase price for Sensipar and/or its generic equivalent prescriptions, other than for resale, manufactured by the Defendants. Local 237 made such payments and/or reimbursements in several states, including New York, Florida, Pennsylvania, and Tennessee, thereby suffering injury to its business and property. During the Class Period, Local 237 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Local 237 was injured in their business or property by reasons of the violations of law alleged herein. Local 237 intends to continue purchasing and/or reimbursing

for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

14.     Defendant, Amgen Inc., ("Amgen") is a corporation organized and existing under the laws of Delaware, having its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1779. Amgen engaged in the worldwide marketing, production and distribution of generic pharmaceutical products, including in this judicial district.

15.     Defendant, Watson Laboratories, Inc., ("Watson Labs") is a company organized and existing under the laws of Nevada, having its principal place of business at 311 Bonnie Circle, Corona, California 92880. Watson Laboratories, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. Watson Laboratories is the owner of the ANDA 204377 which is referenced herein as the "Watson ANDA."

16.     Defendant, Watson Pharmaceuticals, Inc., ("Watson Pharma") is a company organized and existing under the laws of Nevada, having its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054. Effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

17.     Defendant, Actavis plc, f/k/a/ Actavis, Inc., ("Actavis")[2] is a Nevada corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Actavis is a direct or indirect subsidiary of Teva Pharmaceuticals.

18.     Defendant, Actavis Pharma, Inc., ("Actavis Pharma")[3] is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway,

---

[2]     Actavis is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva agreement from which this action arises.

[3]     Actavis Pharma packaged Teva's generic Sensipar.

Parsippany, New Jersey 07054. Actavis is a direct or indirect subsidiary of Teva Pharmaceuticals.

19.     Defendant, Teva Pharmaceutical Industries Ltd., is a company organized and existing under the laws of Israel, having its principal place of business in Petah Tikva, Israel. Effective on or about August 2, 2016, Teva acquired Actavis, plc.

20.     Defendant, Teva Pharmaceuticals USA, Inc., ("Teva Pharma") is a company organized and existing under the laws of Delaware, having its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd.

21.     Defendants Actavis, Inc., Actavis Pharma, Inc., Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc., and Teva Pharmaceuticals, are collectively referred to herein as "**Teva**." Teva sold generic Sensipar throughout the United States between December 27, 2018 and January 2, 2019 under Watson's ANDA.

22.     All of Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

### III.     JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under Clayton Act § 12, 15 U.S.C. § 22.

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

25.     Venue is appropriate within this district under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this district and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district.  Furthermore, both Actavis Inc. and Actavis Pharma, Inc. are headquartered in this district.

26.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## IV.     REGULATORY FRAMEWORK

### A.     The regulatory structure for approval and substitution of generic drugs.

27.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[4] manufacturers that create a new drug must obtain approval from the Food and Drug Administration ("FDA") to sell the product by filing a New Drug Application ("NDA").[5] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[6]

---

[4] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq.*).

[5] 21 U.S.C. §§ 301-392.

[6] 21 U.S.C. § 355(a), (b).

28.     When the FDA approves a brand manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") certain kinds of patents that the manufacturer asserts could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.[7] The manufacturer may list in the Orange Book within 30 days of issuance any patents issued after the FDA approved the NDA.[8]

29.     The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability because it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

**B.      The competitive effects of AB-rated generic competition.**

30.     Generics contain the same active ingredient(s) and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generics and their corresponding brand versions is their price. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a branded product and its generic version, or between generic versions, is price. Typically, generics are at least 10% less expensive than their brand counterparts when there is a single generic competitor. This discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers.

31.     Since the passage of the Hatch-Waxman amendments, every state has adopted drug

---

[7] For example, patents covering processes for making drug products may not be listed in the Orange Book.

[8] 21 U.S.C. § 355(b)(1), (c)(2).

product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic enters the market, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. In a recent study, the FTC found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[9] As a result, competition from generics is viewed by brand manufacturers, such as Amgen, as a grave threat to their bottom lines.

32.     Generic competition enables all indirect purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price.

33.     Until a generic version of the brand enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand, and the brand manufacturer can therefore continue to profitably charge *supra*competitive prices. Brand manufacturers, such as Amgen, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible – including illegal means – to delay or prevent generic competition.

---

[9] *See* FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

### 1. The first AB-rated generic is priced below the brand.

34. Experience and economic research show that the first generic manufacturer to market its product prices it below the prices of its brand counterpart.[10] Every state either requires or permits that a prescription written for the brand be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

### 2. Later generics drive prices down further.

35. Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[11]

36. According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price. Some typical estimates are that entry of a single generic results in a near term retail price reduction of around 10% as compared to the brand price, but that with two generic entrants the near-term retail price reduction is about 50%.

---

[10] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ii-iii, vi, 34 (2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); FTC Pay-for-Delay Study at 1.

[11] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 Int'l J. Indus. Org. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 New Eng. J. Med. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & Econ. 311 (2000).

37.     In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[12] (This percentage erosion of brand sales holds regardless of the number of generic entrants). In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies.

**C.    Pharmaceutical manufacturers game the regulatory structure in order to impair competition.**

38.     When they do not face generic competition, brand manufacturers can usually sell the brand far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins is what economists call market power. When generics enter the market, however, they quickly take 80% or more of the unit sales. And when multiple generics are in the market, the competition between the generics drives their prices to near the marginal cost of production. This competition puts an end to the brand manufacturer's market power and delivers enormous savings to drug purchasers.

39.     Brand and first-filer generic manufacturers have a collective interest in preventing this competition from breaking out. If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits among themselves. They can keep for themselves the enormous savings that competition would

---

[12] FTC 2011 AG Study at 66-67.

have delivered to drug purchasers.

40.     A brand manufacturer in the marketplace without competition from generics gets all of the profits on all of the unit sales.

41.     When generic entry occurs, the brand manufacturer loses most of the unit sales; generic manufacturers sell most of the units, but at drastically reduced prices; and competition delivers enormous savings to drug purchasers. Competition converts what formerly were excess profits into purchaser savings.

42.     To prevent this from happening, brand and generic manufacturers sometimes – unlawfully – agree not to compete and instead split the purchaser savings between themselves.

43.     Figure 1 compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (i.e., with only an agreed entry date and without a pay-off to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed entry date for the generic is earlier and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later, and the brand manufacturer's profits increase significantly. Earlier entry may also occur if the generic manufacturer launches its product at risk (i.e., while the litigation is still pending) or prevails in the patent litigation and then launches its product.

**Figure 1. Impact of Generic Delay on Brand Profits**



44.     In order for such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide the purchaser savings between themselves. The generic manufacturer will not refrain from competing if it does not share in the ill-gotten gains through some means. Pay-offs from the brand manufacturer are the means by which brand and generic manufacturers divide between themselves the ill-gotten gains that delayed competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

45.     The brand manufacturer may choose to – unlawfully – pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its drug also prevents other generic manufacturers from marketing their products.

46.     Later ANDA filers have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there

is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

47.     In the absence of an anticompetitive agreement between the brand company and the first filer, later ANDA filers have procompetitive incentives. They are motivated to expend resources to challenge the brand manufacturer's patent(s) (knowing that the first-filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

48.     When an anticompetitive agreement with the first filer is already in place, however, pursuing the litigation to conclusion becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand manufacturer's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive reverse payment agreement). The later generics have to bear the brunt of the litigation costs themselves and, upon prevailing in the patent litigation, expect to face competition from at least the first-filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand and first-filer generic (such as the Glenmark agreement at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well – greatly reducing the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

49.     Thus, some later generic filers decide to simply give in to or join the conspiracy between the brand manufacturer and the first-filer generic and agree to drop their challenges to the brand manufacturer's patent(s) and stay off the market until after entry by the first filer.

50.     Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's

monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

### D.    Anticompetitive Acceleration Agreements

51.    Brand and generic manufacturers can make their settlement agreements more effective by including "acceleration" clauses. The manufacturers may provide that, in exchange for the No-AG clause, the first-filer will delay entering the market until some future point. The acceleration clause then provides, however, that if any other generic manufacturer succeeds in entering the market before that date, the first filer's entry date is accelerated to that earlier date.

52.    These acceleration clauses are, in practice, anticompetitive, because they reduce any other generic manufacturer's incentive to try to enter the market before the first-filer. Normally, other generic manufacturers would have a possibility of entering the market before the first-filer, thereby enjoying a substantial period with the only ANDA-based generic product on the market. The acceleration clause results in delayed generic entry in at least two ways: (i) the clause directly reduces other generic manufacturers' incentives to file an ANDA or continue litigation in order to gain entry before the first-filer, and (ii) by eliminating the threat to the first-filer's 180-day exclusivity, the clause compensates the first-filer for delaying its entry into the market.

## V.    FACTS

### A.    The Cinacalcet Hydrochloride Patents and FDA Approval

53.    Amgen listed seven patents in the Orange Book as covering Sensipar – U.S. Patent Nos. 6,211,244 (expired on October 23, 2015); 6,001,884 (expiry December 14, 2016); 6,031,003 (expired on December 14, 2016); 6,313,146 (expired December 14, 2016); 6,011,068 (expired March 8, 2018); 7,829,595 (set to expire September 22, 2026), and 9,375,405 (same).

54.     Cinacalcet hydrochloride was developed by Brigham and Women's Hospital, Inc. (the "Hospital") and NPS Pharmaceuticals, Inc. ("NPS"). This resulted in the '068, '003, '244, '146, and '884 patents (each of which has now expired), which specify the production and/or medicinal use of cinacalcet hydrochloride, with the primary substance patent being the '068 patent. These patents were originally were assigned by the inventors to either NPS or NPS and the Hospital.

55.     On March 18, 1996, NPS entered into a licensing agreement with Amgen. Under the agreement, Amgen (1) became the exclusive licensee of the NPS Patents in the United States, (2) was responsible for all development and commercial activities involving Sensipar, and (3) was responsible for enforcing applicable patent rights. In return, NPS would receive royalty payments and milestone payments from Amgen on sales of Sensipar.

56.     On March 8, 2004, the FDA approved Amgen's NDA No. 021688 for using cinacalcet hydrochloride in a method of treating patients with parathyroid carcinoma and secondary hyperparathyroidism. Beginning in April 2004, Amgen marketed, distributed, and sold Sensipar tablets throughout the United States.

57.     Amgen also became the assignee of '595 patent (issued November 9, 2010) and the '405 patent (issued June 28, 2016) from those patents' inventors. The '405 patent is a formulation patent stating claims related to a binder composition that requires one of povidone, hydroxypropyl methylcellulose, hydroxypropyl cellulose, sodium carboxymethylcellulose, or a mixture thereof as a binder present in a pharmaceutical composition.

58.     Amgen knew it would have to rely on its '405 patent to retain its exclusivity and block generics from the market after March 8, 2018.

59. However, the '405 patent has certain intellectual property problems. Claim one of the '405 patent requires, among other things,"(d) from about 1% to 10% by weight of at least one disintegrant selected from the group consisting of crospovidine, sodium starch glycolate, croscarmellose sodium, and mixtures thereof." Thus, if a generic ANDA product formulation does not contain at least one of those chemicals, there can be no literal infringement of claim 1 or any of its dependent claims.

60. Indeed, as discussed below, a federal district court ruled that Teva (*vis a vis* the Watson ANDA) did not infringe any of the asserted claims of the '405 patent because the binder and disintegrant elements are "closed to unrecited binders and disintegrants" and "there could be no literal infringement if the [Watson] ANDA product contained an unrecited (or unlisted) binder or disintegrant."[13]

## B.   ANDA Applicants Seek FDA Approval to Market Generic Sensipar

61. By 2015, Amgen's U.S. sales of Sensipar topped $1 billion in revenues and the brand drug was one of Amgen's top revenue products: 2015 revenue was $1.069 billion, 2016 revenue was $1.24 billion, 2017 revenue was $1.374 billion, and revenue for the first three quarters of 2018 was almost $1 billion.

62. By 2016, generic manufacturers ("ANDA Applicants") began to file ANDAs to obtain approval to market generic versions of this blockbuster drug. Over 20 generic manufacturers filed ANDAs to market their generic cinacalcet hydrochloride products upon expiration of the '068 patent in March 2018. Each of these ANDA Applicants represented to the FDA, via a Paragraph IV certification. Under this Paragraph IV certification, the ANDA

---

[13] *Amgen Inc. v. Amneal Pharms. LLC*, 328 F. Supp. 3d 373, 381 (D. Del. 2018) (Goldberg, J.).

Applicants asserted that Amgen's '405 patent was invalid, unenforceable, or not infringed by the ANDA Applicant's proposed generic drug.

## C.    Amgen the FDA and ANDA Applicants

63.    In September 2016, Amgen filed fourteen lawsuits (later consolidated) against various ANDA Applicants, alleging infringement of the '405 patent in the U.S. District of Delaware. The ANDA Applicants sued by Amgen were: Aurobindo, Micro Labs, Teva (for the Watson ANDA), Cipla, Strides, Sun Pharma, Dr. Reddy's, Ajanta, Amneal, Apotex, Hetero, Breckenridge, Mylan and Zydus.

64.    On May 25, 2017, Amgen also sued the FDA for denying its application for pediatric exclusivity for Sensipar. Obtaining pediatric exclusivity would have given Amgen six months of additional protection against generic manufacturers' market entry.

65.    Amgen alleged that the FDA had improperly denied an additional six months of pediatric exclusivity for Sensipar. Amgen needed the FDA to grant approval by June 8, 2017 in order to satisfy the statutory requirement that pediatric exclusivity for a pharmaceutical product be granted no later than nine months before the expiration of the relevant patent.[14]

66.    On June 5, 2017, the FDA agreed to reconsider Amgen's request, and Amgen and the FDA agreed to stay the litigation pending that review. The FDA also agreed that if Amgen achieved a favorable outcome in the future, it would apply retroactively in order to satisfy the deadline.[15] On August 2, 2017 the FDA again denied Amgen's request.[16]

---

[14] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 1 (D.D.C. May 25, 2017).

[15] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 15 (D.D.C. June 5, 2017).

[16] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 24 (D.D.C. Aug. 10, 2017).

67.     Also in June 2017, Amgen sued four more generic cinacalcet hydrochloride ANDA-filers, Piramal, Alkem, Lupin and Macleods.

68.     Specifically, Amgen claimed in each of these lawsuits, *inter alia*, that the generic cinacalcet hydrochloride product would infringe claims 1-6 and 8-20 of the '405 patent.

69.     The ANDA Applicants responded with defenses including noninfringement, invalidity and prosecution history estoppel. Macleods also counterclaimed alleging sham litigation in violation of the Sherman Act, which Amgen denied.

**D.     Amgen's Patent Litigation And Settlement Strategy**

70.     By of 2017, Amgen began to systematically enter into nearly identical settlements with the various ANDA Applicants. These settlements contained (1) admissions that the ANDA Applicants infringed the '405 patent, (2) agreements not to launch a generic before a certain date, and (3) acceleration clauses that permitted generic entry prior to the agreed date only in the event another manufacturer entered the market earlier with a generic cinacalcet hydrochloride product and only in the event Amgen did not obtain an injunction against the early entrant. For example, on September 11 and 20, 2017, Amgen struck a delay agreement with Apotex and Micro Labs respectively and entered into stipulations of dismissal of the respective cases without prejudice.[17] Similarly Amgen's 2017 Form 10-K, filed with the SEC on February 13, 2018, noted that

> [t]he Delaware District Court signed consent judgments filed by Amgen and Breckenridge on September 21, 2017, by Amgen and Sun on November 2, 2017, by Amgen and Hetero on November 2, 2017, and by Amgen and Ajanta on November 9, 2017, each stipulating to entry of judgment of infringement and validity of the '405 Patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United States of the respective defendant's cinacalcet product during the term of the '405 Patent unless specifically authorized pursuant to the confidential settlement agreement.

---

[17] 1:16-cv-00926, Dkt Nos. 30, 32, and 34.

71.     In February and March 2018,  Amgen settled with Cipla Mylan, Strides, Aurobindo and Macleods. The Cipla, Mylan, Strides, Aurobindo and MacLeods settlement  agreements included, upon information and belief, acceleration clauses or "authorizations" providing that, in the event that any other manufacturer succeeded in entering the market with a generic cinacalcet hydrochloride product before a licensed entry date for the settling generics, the licensed entry date would be accelerated to the earlier date.[18]

72.     Upon information and belief, the settlement agreements that Amgen struck with ANDA Applicants to settle '405 patent litigation included acceleration clauses.

73.     The acceleration clauses were intended to, and did, ensure that no other generic drug manufacturer, no matter how much time and resources it spent in its litigation against Amgen, and no matter how successful the generic drug manufacturer was in the litigation, could enter the

_____

[18] All told, between March 2017 and January 2019, Amgen settled with at least seventeen ANDA Applicants:

| Manufacturer | Date of Settlement |
|---|---|
| Strides Pharma | Mar. 5, 2017 |
| Apotex Corp. | Sept. 11, 2017 |
| Micro Labs | Sept. 20, 2017 |
| Breckenridge Pharmaceutical | Sept. 21, 2017 |
| Sun Pharmaceutical | Nov. 2, 2017 |
| Hetero Labs | Nov. 2, 2017 |
| Ajanta Pharma | Nov. 9, 2017 |
| Cipla Ltd. | Mar. 5, 2018 |
| Mylan Pharmaceuticals | Mar. 5, 2018 |
| Dr. Reddy's Laboratories | Mar. 5, 2018 |
| Aurobindo Pharma | Mar. 23, 2018 |
| Macleods Pharma | Apr. 10, 2018 |
| Lupin Pharmaceuticals | Apr. 23, 2018 |
| Alkem Laboratories | May 9, 2018 |
| Torrent Pharma | June 12, 2018 |
| Heritage | Dec, 7, 2018 |
| Emcure | Dec, 7, 2018 |

market without other generics likewise entering the market.

74. The purpose and effect of the acceleration clauses was to dramatically reduce every generic manufacturer's incentive to try to enter the market before its licensed entry date.

**E.    Amgen Receives Unfavorable Court Rulings, Loses At Trial, And Appeals The Verdict**

75. On January 2018, Amgen suffered a blow to its bid to obtain pediatric exclusivity. A federal district court granted the FDA summary judgment on all but one of Amgen's claims against FCDA and remanded the matter to the FDA for the limited purpose of the FDA addressing whether the FDA's denial of pediatric exclusivity in the case was inconsistent with a prior FDA pediatric-exclusivity decision on Johnson & Johnson's Ortho Tri- Cyclen.

76. The FDA responded that its denial of pediatric exclusivity was appropriate and not inconsistent with its prior decision. Amgen appealed the decision.[19]

77. On February 17, 2018, the federal district court ruled in the FDA's favor. This ended Amgen's bid for six additional months' exclusivity to stay on the market without any generic competition.

78. In its February 2018 earnings call, "Amgen executives cited uncertainty around Sensipar's loss of exclusivity as a big reason for the billion-dollar gap between the low end and high end of the company's 2018 guidance."[20]

79. On March 8, 2018 – the same day that the '068 patent expired – Cipla and Aurobindo received Final Approval to market their generic cinacalcet hydrochloride products under their respective ANDAs, 208915 and 206125 and, but for Amgen's unlawful conduct,

---

[19] *Amgen Inc. v. Azar II*, No. 1:17-cv-1006-RDM, Dkt No. 88 (D.D.C. Feb. 17, 2018).

[20] Eric Sagonowsky, Amgen sued FDA for a 6-month reprieve from Sensipar generics—and lost, FiercePharma (Feb. 21, 2018), https://www.fiercepharma.com/legal/amgen-comes-up-shortlawsuit-against-fda-sensipar-pediatric-exclusivity-as-generics-inch.

would have launched their generic products.

80.     Among the lawsuits Amgen filed against generics was a September 22, 2016 complaint for patent infringement against Watson, Amneal, Piramal, and Zydus, and five other defendants. Amgen asserted that these defendants infringed claims of the '405 patent. The defendants filed counterclaims asserting that the patent was invalid and/or not infringed.

81.     A four-day bench trial on the infringement issue, as to the four remaining non-settling defendants, Amneal, Piramal, Watson and Zydus, began on March 5, 2018.

82.     On July 27, 2018, Judge Goldberg ruled that Watson, Amneal and Piramal did not infringe any of the asserted claims of the '405 patent.[21]

83.     Judge Goldberg also found that the product described in Zydus' ANDA would not infringe some of the asserted claims but would infringe others.[22]

84.     148. On August 24, 2018, Judge Goldberg entered final judgment stating, *inter alia*, that "[a] judgment of NON-INFRINGEMENT of claims 1-6 and 8-20 of the '405 patent is hereby entered in favor of Watson and against Amgen."

85.     The court dismissed without prejudice, as moot, the generic manufacturer defendants' invalidity counterclaims.

86.     On September 25, 2018, Amgen appealed to the United States Court of Appeals for the Federal Circuit. At this time, the appeal remains pending.[23]

87.     On November 30, 2018, Amgen filed its opening brief with the Court of Appeals for the Federal Circuit. The brief largely focuses on issues of claim construction and infringement

---

[21] *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 386, 396 (D. Del. 2018).

[22] *Id*. at 399.

[23] *See Amgen Inc. v. Amneal Pharm., LLC*, Nos. 2018-2414, 2019-1086 (Fed. Cir. Sept. 25, 2018).

that have no bearing on the case against Watson. Amgen's brief did not address the district court's opinion on the doctrine of equivalents analysis as to Watson until page 55 of its 64-page brief.

**E.      The FDA Approves The Watson ANDA And A Generic Is Launched**

88.      The FDA has approved at least seven ANDAs:

| Company | Approval Date |
|---|---|
| Cipla Ltd | March 8, 2018 |
| Aurobindo Pharma. Ltd | March 8, 2018 |
| Strides Pharma Global PTE Ltd | April 30, 2018 |
| Piramal Healthcare UK Ltd | August 1, 2018 |
| Sun Pharma Global | October 11, 2018 |
| Mylan Pharmaceuticals Inc. | October 16, 2018 |
| Teva (Watson) | December 27, 2018 |

89.      On December 27, 2018, the same day FDA approved the Watson ANDA, Teva launched the Watson ANDA generic cinacalcet hydrochloride product at-risk (while Amgen lost at trial, they appealed, so the litigation was technically still pending). Teva knew that its generic launch was a substantial threat to Amgen because the launch could trigger any acceleration clauses in the settlements of other ANDA Applicants and could open the floodgates to more generic entrants.

90.      Generic Sensipar had tremendous success. Upon information and belief, over the course of approximately seven days, Teva sold six weeks' worth of product at a twenty-five percent discount off the cost of Sensipar. In the course of about a week, Teva sold roughly six weeks' worth of generic Sensipar. Those sales generated profits of at least $59 million (assuming a 25% discount off Sensipar's price). Teva's launch also caused Amgen to lose an estimated $79 million in profits.[24]

---

[24] Sue Sutter, Launch Abbreviated: Teva Halts US Generic Sensipar Sales After Patent Deal With Amgen, Pink Sheet (Jan. 3, 2019).

**F.     The Amgen-Teva Agreement Eliminates Generic Sensipar**

91.     On January 2, 2019, after Amgen filed its opening appellate brief, but before a response brief was filed, Amgen and Teva executed a settlement resolving their respective infringement claims and invalidity counterclaims as to the '405 patent (the "Amgen-Teva Agreement"). This settlement was entered into, despite the fact that the district court issued a non-infringement ruling against Amgen.

92.     Under the terms of the Amgen-Teva Agreement, the parties agreed to request that the district court to approve a consent judgment which contradicted the district court's previous finding of noninfringement, stating:

> . . . that the manufacture, use, sale, offer to sell, and distribution of [its] Products in the United States and importation of [its] Product into the United States, would infringe the ['405] Patent"; and [that], except as otherwise provided in the Agreement, Watson, along with its "successors and assigns, [is] enjoined until the date of expiration or lapse of the last to expire claim of the ['405] Patent, including any extensions and/or additional periods of exclusivity to which Amgen is or becomes entitled, from infringing the ['405] Patent by making, having made, using, selling, offering to sell, or distributing [its] Products in the United States, or importing [its] Products into the United States.

93.     In order to enter this consent judgment, the parties requested that the district court vacate its findings made at the bench trial that Watson's ANDA Products do not infringe the '405 patent.

94.     To affect this reversal, Amgen and Teva jointly moved the district court to issue an Indicative Ruling under Federal Rule of Civil Procedure 62.1 that it would grant the parties' motion under Federal Rule of Civil Procedure 60(b) to vacate its non-infringement ruling as to the Watson ANDA's generic product and enter the parties' proposed consent judgment, including Teva's admission of infringement. If the Court issues the requested ruling, the parties would jointly notify the Federal Circuit and request that it remand Amgen's appeal as to Teva under

Appellate Rule 12.1 to allow the district court to enter the appropriate orders.

95.    The Court of Appeals has stayed the briefing schedule pending the District Court's disposition of the request for an indicative ruling.

96.    Also in connection with the Amgen-Teva Agreement, Teva (1) immediately pulled its generic product from the market, eliminating existing competition from Teva, which was costing Amgen tens of millions of dollars; (2) agreed to stay off the market and delay selling its generic product until a "license date" in mid-2021 or earlier depending on certain occurrences; and (3) paid Amgen an undisclosed sum that was, upon information and belief, far less than the hundreds of millions Teva would have been required to pay Amgen had it been found to infringe the '405 patent. The acceleration clauses Amgen had included in its prior settlements with would-be generic Sensipar manufactures included a "safe harbor" period, giving Amgen a period to try to stop the generic that launched. The acceleration clause would only take effect after the safe harbor period lapses. Amgen's quick deal with Teva prevented these acceleration clauses from triggering.[25]

97.    Amgen then contacted other ANDA Applicants to leverage its agreement with Teva. On January 4, 2019, counsel for Amgen wrote a letter to counsel for ANDA Applicant Cipla, stating: "Please confirm immediately that Cipla has not and will not engage in an "at risk" launch based on [Teva]'s At Risk Launch. Otherwise Amgen will seek all remedies available under the Cipla Agreement and under applicable law, including injunctive relief, breach of

---

[25] In Amgen's April 2018 quarterly filing with the Securities and Exchange Commission, Amgen disclosed that its consent judgments with certain generic manufacturers imply that those agreements contain acceleration clauses. Specifically, Amgen stated that the "injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United States of the applicable defendants' cinacalcet hydrochloride product during the term of the '405 Patent" would not apply under certain circumstances. Amgen SEC Form 10-Q at 25-26, filed Apr. 25, 2018.

contract, treble damages, and sanctions." Days later, Cipla's counsel sent a letter to Judge Goldberg on January 10, 2019 stating that Cipla believes the Amgen-Teva Agreement is "anticompetitive, has far-reaching consequences, and raises important legal questions that are not rightly swept under the rug as the Motion would have the Court do without comment."[26]

98.     Through the Amgen-Teva Agreement, the Defendants removed a significantly cheaper generic product from the market, forestalled the launch of other approved generic cinacalcet hydrochloride products by prior settling generic manufacturers, and, upon information and belief, Teva secured, *inter alia*, a valuable launch position worth millions of dollars and likely millions from its several days' launch. As a result, Class members were deprived unlawfully of less expensive generic cinacalcet hydrochloride.

## VI.     EFFECTS OF THE SCHEME ON COMPETITION AND DAMAGES TO THE PLAINTIFFS AND THE CLASS

99.     By 2015, Amgen's U.S. sales of Sensipar topped $1 billion in revenues and the brand drug was one of Amgen's top revenue products: 2015 revenue was $1.069 billion, 2016 revenue was $1.24 billion, 2017 revenue was $1.374 billion, and revenue for the first three quarters of 2018 was almost $1 billion. These amounts represent billions of dollars more in sales than Amgen would have achieved absent Defendants' unlawful scheme to impair generic competition. Generic Sensipar products would have been priced at a fraction of the cost of brand Sensipar and would have quickly captured the vast majority of the market for cinacalcet hydrochloride.

100.     Defendants' unlawful agreements impaired and delayed the sale of generic Sensipar in the United States and unlawfully enabled Amgen to sell its branded Sensipar at artificially

---

[26] Letter from M. Farnan to The Honorable Mitchell S. Goldberg, dated January 10, 2019, *Amgen Inc. v. Amneal Pharm.*, No. 1:16-cv-00853 (D. Del.) (Dkt No. 414).

inflated prices. But for Defendants' unlawful conduct, generic competitors would have been able to compete, unimpeded, with their own generic versions of Sensipar at a much earlier date.

101.    Absent Defendants' anticompetitive conduct, Plaintiffs and other members of the Class would have: (1) purchased lower-priced generic Sensipar, and (2) paid lower prices for generic Sensipar products sooner , as a result of the entry of generics at an earlier date.

102.    As a consequence, Plaintiffs and other indirect purchasers have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## VII.    MARKET POWER AND DEFINITION

103.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Sensipar, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while patient (and in most cases his or her insurer) has the obligation to pay for the product.

104.    Brand manufacturers exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

105.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price

goes up. This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Sensipar.

106.    Brand Sensipar does not exhibit significant, positive cross-elasticity of demand with respect to price with any other cinacalcet hydrochloride product or treatment for kidney disease or thyroid cancer, other than AB-rated generic versions of Sensipar.

107.    Brand Sensipar is differentiated from all other cinacalcet hydrochloride products, and all other kidney disease and thyroid treatments, other than the AB-rated generic versions of Sensipar.

108.    Amgen needed to control only brand Sensipar and its AB-rated generic equivalents, and no other products, in order to maintain the price of cinacalcet hydrochloride profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Sensipar without losing substantial sales.

109.    Defendants had, and exercised, the power to exclude generic competition to brand Sensipar.

110.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Sensipar from the forces of price competition.

111.     There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Sensipar and generic Sensipar, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, *inter alia*, the following facts: (a) generic Sensipar would have entered the market at a much earlier date, at a substantial discount to brand Sensipar, but for Defendants' anticompetitive conduct; and (b) Amgen's gross margin on Sensipar (including the costs of ongoing research/development and marketing) at all relevant times was very high.

112.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiffs allege that the relevant antitrust market is the market for Sensipar and its AB-rated generic equivalents.

113.     The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

114.     Amgen's market share in the relevant market was 100% until December 2018, when Teva sold generic Sensipar for only one week. After Amgen's settlement with Teva, it again obtained 100% market share.

## VIII.   MARKET EFFECTS

115.     Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay competition on the products' merits, to further Amgen's anticompetitive purpose of forestalling generic competition against Sensipar, in which Teva cooperated in order to increase its own profits. Defendants carried out the scheme with the anticompetitive intent and effect of maintaining supra-competitive prices for cinacalcet hydrochloride.

116.     Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Sensipar from competition. These

actions allowed Defendants to maintain a monopoly and exclude competition in the market for Sensipar and its AB-rated generic equivalents, to the detriment of Plaintiffs and all other members of the Class.

117.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Amgen to sell Sensipar without further generic competition. Were it not for Defendants' illegal conduct, one or more additional generic versions of Sensipar would have entered the market sooner.

118.    Defendants' illegal acts and conspiracy to delay generic competition for Sensipar caused Plaintiffs and all members of the Class to pay more than they would have paid for cinacalcet hydrochloride absent this illegal conduct.

119.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant market, end-payors, such as Plaintiffs and members of the Class, would have paid less for cinacalcet hydrochloride by (a) paying lower prices on their remaining brand purchases of Sensipar, (b) substituting purchases of less expensive generic Sensipar for their purchases of more expensive brand Sensipar, and/or (c) purchasing generic Sensipar at lower prices sooner.

120.    Thus, Defendants' unlawful conduct deprived Plaintiffs and members of the Class of the benefits from the competition that the antitrust laws are designed to ensure.

## IX.    ANTITRUST IMPACT

121.    During the relevant time period, Plaintiffs and members of the Class purchased substantial amounts of Sensipar and/or generic Sensipar indirectly from the Defendants. As a result of Defendants' illegal conduct, Plaintiffs and members of the Class were compelled to pay, and did pay, artificially inflated prices for their Sensipar purchases. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal

conduct alleged herein, because: (i) the price of brand name Sensipar was artificially inflated by Defendants' illegal conduct; and/or (ii) Class members were deprived of the opportunity to purchase lower priced versions of Sensipar and generic Sensipar sooner.

122. As a consequence, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to end-payors such as Plaintiffs and members of the Class.

123. General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Sensipar results in higher prices at every level below. Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624. Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

124. The institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Sensipar and/or generic Sensipar to Plaintiffs and members of the Class. Further, the delayed entry of generic competition at the direct purchaser level similarly injured end-payors who were equally denied the opportunity to purchase less expensive generic Sensipar.

125. Thus, Defendants' unlawful conduct deprived Plaintiffs and the Class of the benefits of competition that the antitrust laws were designed to ensure.

126. Defendants' unlawful anticompetitive conduct alleged herein enabled them to indirectly charge end-payors prices in excess of what they otherwise would have been able to charge absent their unlawful actions.

127. Prices of Sensipar and generic Sensipar were artificially inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

128. The supracompetitive prices Plaintiffs and members of the Class paid are traceable to, and the direct, proximate, and foreseeable result of, Defendants' anticompetitive conduct.

129. The overcharges Plaintiffs and members of the Class paid are traceable to, and the direct, proximate, and foreseeable result of, Defendants' supracompetitive pricing.

## X.     INTERSTATE AND INTRASTATE COMMERCE

130. Defendants' anticompetitive conduct has substantially affected intrastate, interstate and foreign commerce.

131. Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, it deprived retailers within each state of access to less expensive generic Sensipar that they could sell to end-payors within each respective state. The delayed entry of generic Sensipar has directly affected and disrupted commerce for end-payors within each state.

132. During the relevant time period, Sensipar was shipped into each state, and end-payors paid for Sensipar in each state.

133. During the relevant time period, Defendants manufactured, promoted, distributed, and sold substantial amounts of Sensipar and/or generic Sensipar in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

134. During the relevant time period, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Sensipar.

## XI.  CLASS ACTION ALLEGATIONS

135. Plaintiffs brings this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States") on behalf of the following Class:

> All persons and entities in the Indirect Purchaser States who indirectly purchased, paid for and/or provided reimbursement for some or all of the purchase price of Sensipar or its AB-rated generic equivalents in any form from Defendants from March 8, 2018 until the effects of Defendants' conduct cease (the "Class Period").

136. The following persons and entities are excluded from the Class:

a. Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

b. all federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

c. All persons or entities who purchased Sensipar or generic Sensipar for purposes of resale or directly from Defendants or their affiliates;

d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

e. Flat co-payers (i.e., consumers who paid the same co-payment amount for brand and generic drugs);

f. Pharmacy benefit managers;

g. All judges assigned to this case and any members of their immediate families; and

h. All counsel of record.

137. The Class is sufficiently numerous. The Class is so numerous and widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for Plaintiffs to bring individual claims and join them together. Given this drug's blockbuster status, Plaintiffs believe there are hundreds of thousands, if not millions, of members in the Class, in an amount to be determined in discovery and at trial. The identities of Class members will be readily ascertainable through business records kept in regular order.

138. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the other Class members. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants – Plaintiffs and the Class paid *supra*competitive prices for Sensipar and were deprived of the benefits of competition as a result of Defendants' unlawful conduct alleged herein.

139. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other members of the Class.

140. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products.

141. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants'

wrongful conduct. Questions of law and fact common to the Class include:

a. Whether Defendants' conspired to delay generic competition in the market for cinacalcet hydrochloride tablets;

b. Whether Defendants' agreement was a *per se* violation of federal and state antitrust laws;

c. Whether Defendants' agreement violated federal and state antitrust laws under a "quick look" analysis;

d. Whether Defendants' agreement violated federal and state antitrust laws under a Rule of Reason analysis;

e. To the extent the Rule of Reason applies, whether the relevant product market is cinacalcet hydrochloride tablets;

f. To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

g. Whether Amgen unlawfully maintained monopoly power through the Defendants' Agreement;

h. Whether Defendants' scheme, in whole or in Part, has substantially affected intrastate and interstate commerce;

i. Whether Defendants' agreement harmed competition;

j. For the Injunction Class, the nature and scope of injunctive relief;

k. For the Damages Class, whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiffs and the members of the Class;

l.  For the Damages Class, the quantum of overcharges paid by the Class in the aggregate.

m.  Disgorgement

142.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

143.  Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XII.  CLAIMS FOR RELIEF

### COUNT I

**MONOPOLIZATION UNDER STATE LAW**
**(Against Amgen)**

144.  Plaintiffs incorporate by reference the preceding allegations and paragraphs.

145.  At all relevant times, Amgen possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Amgen possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

146.  Through the overarching anticompetitive scheme, as alleged extensively above, Amgen willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, in order to exclude competition for its monopolized Sensipar product.

147. The goal, purpose and effect of Amgen's scheme was to prevent and delay the sale of Sensipar products in the United States at prices substantially below Amgen's prices for Sensipar, thereby effectively preventing the average market price of Sensipar products from declining dramatically.

148. By engaging in the foregoing conduct, Amgen has violated the following states' antitrust and/or unfair and deceptive trade practices acts of:

a) Arizona: The aforementioned practices by the Defendant were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Arizona by Class members and/or purchases by Arizona residents.

b) California: The aforementioned practices by the Defendant were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in California by Class members and/or purchases by California residents.

c) District of Columbia: The aforementioned practices by the Defendant were and are in violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in District of Columbia by Class members and/or purchases by District of Columbia residents.

d) Illinois: The aforementioned practices by the Defendant were and are in violation of 740 Ill. Comp. Stat. 10/7(2) with respect to purchases of Sensipar and AB-rated generic equivalents in Illinois by Class members and/or purchases by Illinois residents.

e) Iowa: The aforementioned practices by the Defendant were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997) with respect to purchases of Sensipar and AB-rated generic equivalents in Iowa by Class members and/or purchases by Iowa residents.

f) Kansas: The aforementioned practices by the Defendant were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §50-101, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Kansas by Class members and/or purchases by Kansas residents.

g) Maine: The aforementioned practices by the Defendant were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Maine by Class members and/or purchases by Maine residents.

<u>Michigan</u>: The aforementioned practices by the Defendant were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Michigan by Class members and/or purchases by Michigan residents.

h) <u>Minnesota</u>: The aforementioned practices by the Defendant were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Minnesota by Class members and/or purchases by Minnesota residents.

i) <u>Mississippi</u>: The aforementioned practices by the Defendant were and are in violation of Miss. Code Ann. § 75-21-1, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Mississippi by Class members and/or purchases by Mississippi residents.

j) <u>Nebraska</u>: The aforementioned practices by the Defendant were and are in violation of Ne. Rev. Stat. § 59-801, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Nebraska by Class members and/or purchases by Nebraska residents.

k) <u>Nevada</u>: The aforementioned practices by the Defendant were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Nevada by Class members and/or purchases by Nevada residents.

l) <u>New Mexico</u>: The aforementioned practices by the Defendant were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in New Mexico by Class members and/or purchases by New Mexico residents.

m) <u>New York</u>: The aforementioned practices by the Defendant were and are in violation of N.Y. Gen. Bus. Law § 340, *et seq.*, and, N.Y. Gen. Bus. Law § 349, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in New York by Class members and/or purchases by New York residents.

n) <u>North Carolina</u>: The aforementioned practices by the Defendant were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. § 75-1, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in North Carolina by Class members and/or purchases by North Carolina residents.

o) <u>North Dakota</u>: The aforementioned practices by the Defendant were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in North Dakota by Class members and/or purchases by North Dakota residents.

p) <u>Puerto Rico</u>: The aforementioned practices by the Defendant were and are in violation of the Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA § 257, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Puerto Rico by Class members and/or purchases by Puerto Rico residents.

q) <u>South Dakota</u>: The aforementioned practices by the Defendant were and are in violation of South Dakota's antitrust law, S.D. Codified Laws § 37-1-3, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in South Dakota by Class members and/or purchases by South Dakota residents.

r) <u>Tennessee</u>: The aforementioned practices by the Defendant were and are in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Tennessee by Class members and/or purchases by Tennessee residents.

s) <u>West Virginia</u>: The aforementioned practices by the Defendant were and are in violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1 with respect to purchases of Sensipar and AB-rated generic equivalents in West Virginia by Class members and/or purchases by West Virginia residents.

t) <u>Wisconsin</u>: The aforementioned practices by the Defendant were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.01, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Wisconsin by Class members and/or purchases by Wisconsin residents.

149.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendant's antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Sensipar, sooner, and (2) paying higher prices for Sensipar than they would have paid in the absence of Defendant's conduct. These injuries are the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful.

150.    Plaintiffs and the Class seek damages and multiple damages as permitted by law for their injuries by Defendant's violations of the aforementioned statutes.

## COUNT II

### CONSPIRACY AND COMBINATION
### IN RESTRAINT OF TRADE UNDER STATE LAW
(Against All Defendants)

151.     Plaintiffs incorporate by reference the preceding allegations and paragraphs.

152.     Defendants willfully and unlawfully engaged in a continuing contract, combination or conspiracy with respect to the sale of Sensipar and/or its AB- rated generic equivalents in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

153.     During the Class Period, Defendants entered into an unlawful reverse payment agreement that restrained competition in the market for Sensipar and/or its AB- rated generic equivalents.

154.     In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

155.     Defendants' conspiracy had the following effects, among others:

a. It delayed generic entry of Sensipar in order to lengthen the period in which Amgen's brand Sensipar could monopolize the market and make supra-competitive profits;

b. It raised and maintained the prices that Plaintiffs and other members of the Class would pay for Sensipar at supra-competitive levels.

156.     Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Sensipar and/or its AB-rated generic equivalents.

157.     There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on End-Payors and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve

the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.* 570 U.S. 136 (2013).

158. The Agreements among Defendants to restrained competition in the Sensipar market includes overt acts between separate economic entities—actual and potential competitors.

159. Defendants' each committed at least one over act in furtherance of the conspiracy.

160. Defendants' conduct described herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unfair conduct under the following state statutes:

    a) <u>Arizona</u>: The aforementioned practices by the Defendants were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Arizona by Class members and/or purchases by Arizona residents.

    b) <u>California</u>: The aforementioned practices by the Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*,

    c) <u>District of Columbia</u>: The aforementioned practices by the Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §28-4502, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in the District of Columbia by Class members and/or purchases by District of Columbia residents.

    d) <u>Hawaii:</u> The aforementioned practices by the Defendants were and are in violation of the <u>Haw. Code § 480-1, *et seq.*,</u> with respect to purchases of Sensipar and AB-rated generic equivalents in Hawaii by Class members and/or purchases by Hawaii residents.

    e) <u>Illinois</u>: The aforementioned practices by the Defendants were and are in violation of 740 Ill. Comp. Stat. 10/7(2); with respect to purchases of Sensipar and AB-rated generic equivalents in Illinois by Class members and/or purchases by Illinois residents.

    f) <u>Iowa</u>: The aforementioned practices by the Defendants were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997); with respect to purchases of Sensipar and AB-rated generic equivalents in Iowa by Class members and/or purchases by Iowa residents.

    g) <u>Kansas</u>: The aforementioned practices by the Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann.

§50-101, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in Kansas by Class members and/or purchases by Kansas residents.

h) <u>Maine</u>: The aforementioned practices by the Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in Maine by Class members and/or purchases by Maine residents.

i) <u>Michigan</u>: The aforementioned practices by the Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Michigan by Class members and/or purchases by Michigan residents.

j) <u>Minnesota</u>: The aforementioned practices by the Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Minnesota by Class members and/or purchases by Minnesota residents.

k) <u>Mississippi</u>: The aforementioned practices by the Defendants were and are in violation of Miss. Code Ann. § 75-21-1, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in Mississippi by Class members and/or purchases by Mississippi residents.

l) <u>Nebraska</u>: The aforementioned practices by the Defendants were and are in violation of Ne. Rev. Stat. § 59-801, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in Nebraska by Class members and/or purchases by Nebraska residents.

m) <u>Nevada</u>: The aforementioned practices by the Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Nevada by Class members and/or purchases by Nevada residents.

n) <u>New Hampshire</u>:  The aforementioned practices by the Defendants were and are in violation of the N.H. Rev. Stat. Ann. § 356:1, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in New Hampshire by Class members and/or purchases by New Hampshire residents.

o) <u>New Mexico</u>: The aforementioned practices by the Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in New Mexico by Class members and/or purchases by New Mexico residents.

p) <u>New York</u>: The aforementioned practices by the Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, with respect

to purchases of Sensipar and AB-rated generic equivalents in New York by Class members and/or purchases by New York residents.

q) <u>North Carolina</u>: The aforementioned practices by the Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. § 75-1, *et seq.*; with respect to purchases of Sensipar and AB-rated generic equivalents in North Carolina by Class members and/or purchases by North Carolina residents.

r) <u>North Dakota</u>: The aforementioned practices by the Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in North Dakota by Class members and/or purchases by North Dakota residents.

s) <u>Oregon</u>: The aforementioned practices by the Defendants were and are in violation of Or. Rev. Stat. §§ 646.725, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Oregon by Class members and/or purchases by Oregon residents.

t) <u>Puerto Rico</u>: The aforementioned practices by the Defendants were and are in violation of Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA § 257, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Puerto Rico by Class members and/or purchases by Puerto Rico residents.

u) <u>Rhode Island</u>:  The aforementioned practices by the Defendants were and are in violation of R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Rhode Island by Class members and/or purchases by Rhode Island residents.

v) <u>South Dakota</u>: The aforementioned practices by the Defendant were and are in violation of South Dakota's antitrust law, S.D. Codified Laws § 37-1-3, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in South Dakota by Class members and/or purchases by South Dakota residents.

w) <u>Tennessee</u>: The aforementioned practices by the Defendants were and are in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Tennessee by Class members and/or purchases by Tennessee residents.

x) <u>Utah</u>:  The aforementioned practices by the Defendants were and are in violation of the Utah Code Ann. § 76-103014, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Utah by Class members and/or purchases by Utah residents.

y) <u>West Virginia</u>: The aforementioned practices by the Defendants were and are in violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1 with respect to purchases of Sensipar and AB-rated generic equivalents in West Virginia by Class members and/or purchases by West Virginia residents.

z) <u>Wisconsin</u>: The aforementioned practices by the Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.01, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Wisconsin by Class members and/or purchases by Wisconsin residents.

161. Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Sensipar, sooner, and (2) paying higher prices for Sensipar than they would have paid in the absence of Defendants' conduct. These injuries are the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

162. Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to these statutes.

## COUNT III

### VIOLATIONS OF STATE CONSUMER PROTECTION AND/OR DECEPTIVE TRADE PRACTICES ACTS

#### (Against All Defendants)

163. Plaintiffs incorporates by reference the preceding allegations and paragraphs.

164. Defendants engaged in unfair competition or unfair, unconscionable acts or practices in violation of the state consumer protection statutes to wrongfully perpetuate their concerted conduct to restrain trade in the relevant market.

165. As a direct and proximate result of Defendants' unfair, unconscionable and/or deceptive conduct, Plaintiffs and the Class members were: (1) denied the opportunity to purchase lower-priced generic Sensipar; and 2) paid higher prices for Sensipar and/or its AB-rated generics that they would have paid but for Defendants' conduct.

166. The Agreements among Defendants to allow Amgen to monopolize the Sensipar market includes overt acts between separate economic entities—actual and potential competitors—and is illegal under state antitrust laws.

167. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

168. There was and is a gross disparity between the price that Plaintiffs and the Class members paid for Sensipar and the value they received. Much more affordable generic Sensipar would have been available sooner and in greater quantity, and prices for Sensipar would have been far lower, but for Defendants' unfair, unconscionable, and deceptive conduct.

169. As a direct and proximate result of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct, Plaintiffs and Class members were denied the opportunity to purchase generic Sensipar and forced to pay higher prices for Sensipar and generic Sensipar.

170. By engaging in such conduct, Defendants violated the following consumer protection laws:

    a.   <u>Arizona</u>: The aforementioned practices by the Defendants were and are in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in Arizona by Class members and/or purchases by Arizona residents.

    b.   <u>California</u>: The aforementioned practices by the Defendants were and are in violation of the California Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in California by Class members and/or purchases by California residents.

    c.   <u>Florida</u>: The aforementioned practices by the Defendant were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201, *et seq.* with respect to purchases of Sensipar and AB-

rated generic equivalents in Florida by Class members and/or purchases by Florida residents.

d.     Hawaii: The aforementioned practices by the Defendant were and are in violation of the Haw. Rev. Stat. §§ 481-1 to 481-11 with respect to purchases of Sensipar and AB-rated generic equivalents in Hawaii by Class members and/or purchases by Hawaii residents.

e.     Illinois: The aforementioned practices by the Defendant were and are in violation of 815 ILCS §§ 505/1, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Illinois by Class members and/or purchases by Illinois residents.

f.     Massachusetts:  The aforementioned practices by the Defendant were and are in violation of the Massachusetts Consumer Protection Act ("MCPA") Mass. Gen. L. Ch. 93A §2(a) *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Massachusetts by Class members and/or purchases by Massachusetts residents.

g.     Nebraska: The aforementioned practices by the Defendant were and are in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Nebraska by Class members and/or purchases by Nebraska residents.

h.     Nevada: The aforementioned practices by the Defendant were and are in violation of the Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in Nevada by Class members and/or purchases by Nevada residents.

i.     New Hampshire: The aforementioned practices by the Defendant were and are in violation of the N.H. Rev. Stat. §§ 358-A:1, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in New Hampshire by Class members and/or purchases by New Hampshire residents.

j.     New Mexico: The aforementioned practices by the Defendant were and are in violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in New Mexico by Class members and/or purchases by New Mexico residents.

k.     North Carolina: The aforementioned practices by the Defendant were and are in violation of N.C. Gen. Stat. §§ 75-1.2, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in North Carolina by Class members and/or purchases by North Carolina residents.

l.     Virginia:  The aforementioned practices by the Defendant were and are in violation of Va. Code §§ 59.1-196, *et seq.* with respect to purchases of

Sensipar and AB-rated generic equivalents in Virginia by Class members and/or purchases by Virginia residents.

m.  West Virginia: The aforementioned practices by the Defendant were and are in violation of the West Virginia Antitrust Act, W. Va. Code § 46A-6-101. *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in West Virginia by Class members and/or purchases by West Virginia residents.

171.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendant's anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Sensipar, sooner, and (2) paying higher prices for Sensipar than they would have paid in the absence of Defendant's conduct. Their injury consists of paying higher prices for Sensipar and/or generic Sensipar than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

172.    On behalf of themselves and the Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

## COUNT IV

### UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS
(Against All Defendants)

173.    Plaintiffs incorporate by reference the preceding allegations and paragraphs.

174.    To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

175.    Defendants have benefited from overcharges on the sales of Sensipar and/or its AB rated generics made possible by the unlawful and inequitable acts alleged in this Complaint.

176. By paying more for Sensipar and/or its AB rated generics than they would have in the absence of Defendants' wrongful conduct, Plaintiffs and the Class have conferred an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Class.

177. It would be futile for Plaintiffs and Class members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiffs and Class members.

178. It would be futile for Plaintiffs and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Sensipar and/or its AB rated generics, as those intermediaries are not liable and would not compensate Plaintiffs and Indirect Purchaser Class members for the Defendants' unlawful conduct.

179. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Sensipar and/or its AB rated generics is a direct and proximate result of Defendants' unlawful practices.

180. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, who paid anticompetitive prices that inured to the Defendants' benefit.

181. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Class.

182. Equity demands that Defendants be required to make restitution and return the overpayment to Plaintiffs and the Class.

183. Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution in the following States:

## Unjust Enrichment: Alabama

185. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

186. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Alabama indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

187. Defendants should be ordered to make restitution for the benefit of Alabama indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Arizona

188. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

189. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Arizona indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

190. Plaintiffs and Class Members have been impoverished by the overcharges for SENSIPAR AND/OR ITS AB RATED GENERICS resulting from Defendants' unlawful conduct.

191. Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received from Plaintiffs and Class Members.

192.     Plaintiffs and Class Members have no remedy at law.

193.     The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of SENSIPAR AND/OR ITS AB RATED GENERICS to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Arkansas

194.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

195.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Arkansas indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

196.     Defendants were enriched by their illegal activities at the expense of Arkansas indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Arkansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: California

197.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

198. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including California indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

199. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

200. Defendants were enriched by their illegal activities at the expense of California indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Colorado

201. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

202. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Colorado indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

203. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

204. Defendants should be ordered to make restitution for the benefit of Colorado indirect purchasers because it would unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: District of Columbia

205. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

206. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including District of Columbia indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

207. Defendants have accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

208. Defendants were enriched by their illegal activities at the expense of the District of Columbia indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of the District of Columbia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Florida

209. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

210. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Florida indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

211.    Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Hawaii

212.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

213.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Hawaii indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

214.    Defendants were enriched by their illegal activities at the expense of Hawaii indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Hawaii indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Illinois

215.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

216. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Illinois indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

217. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

218. Defendants were enriched by their illegal activities at the expense of Illinois indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Illinois indirect purchasers because it would be against equity, justice, and good conscience to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: Iowa

219. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

220. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Iowa indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

221. Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Iowa indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Kansas

222.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

223.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Kansas indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

224.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

225.    Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Maine

226.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

227.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Maine indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

228.     Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.  Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

229.     Defendants were enriched by their illegal activities at the expense of Maine indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Maine indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: Massachusetts

230.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

231.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Massachusetts indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

232.     Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Class Members.

233.     Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust and inequitable and unfair to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Michigan

234.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

235.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Michigan indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

236.     Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

237.     Defendants were enriched by their illegal activities at the expense of Michigan indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Michigan indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Minnesota

238.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

239.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Minnesota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

240.     Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members.

241.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: Mississippi

242.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

243.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Mississippi indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

244.    Defendants have retained the benefit of these overcharges, which in equity and good conscience belong to Plaintiffs and the Class Members on account of Defendants' anticompetitive conduct.

245.    Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Nebraska

246. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

247. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Nebraska indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

248. Defendants have not paid any consideration to anyone in exchange for the financial benefits bestowed upon them.

249. Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Nevada

250. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

251. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Nevada indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

252. Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which they have paid no consideration to any other person.

253. Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

254. Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: New Hampshire

255. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

256. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New Hampshire indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

257. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

258. Defendants were enriched by their illegal activities at the expense of New Hampshire indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of New Hampshire indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: New Mexico

259.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

260.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New Mexico indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

261.    Defendants have not paid any consideration to any other person for any of the benefits they received.

262.    Defendants have knowingly benefitted at the expense of Plaintiffs and Class Members from revenue resulting from unlawful overcharges for SENSIPAR AND/OR ITS AB RATED GENERICS.

263.    Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of New Mexico indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: New York

264.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

265. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New York indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

266. Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: North Carolina

267. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

268. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including North Carolina indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

269. The financial benefits the Defendants derived as a result of Defendants' unlawful practices were not conferred on the Defendants officiously, gratuitously, or voluntarily.

270. The financial benefits Defendants derived from Plaintiffs and IPP class members who paid anticompetitive prices for SENSIPAR AND/OR ITS AB RATED GENERICS is measurable.

271. Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

272.    Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of North Carolina indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: North Dakota

273.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

274.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including North Dakota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

275.    Defendants have been enriched by revenue resulting from these unlawful overcharges for SENSIPAR AND/OR ITS AB RATED GENERICS.

276.    Plaintiffs and Class Members have been impoverished by paying anticompetitive overcharges for SENSIPAR AND/OR ITS AB RATED GENERICS as a result of Defendants' unlawful conduct.

277.    Defendants' enrichment and Plaintiffs' impoverishment are connected.  Defendants have paid no consideration to any other person for any benefit they received.

278.    Defendants were enriched by their illegal activities at the expense of North Dakota indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because

it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

279. Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: Oregon

280. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

281. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Oregon indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

282. Defendants were aware of and have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

283. Defendants were enriched by their illegal activities at the expense of Oregon indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Oregon indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: Puerto Rico

284. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

285. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Puerto Rico indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

286.     Defendants were enriched by their illegal activities at the expense of Puerto Rico indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Puerto Rico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

287.     Plaintiffs and Class Members have no remedy at law.

### Unjust Enrichment: Rhode Island

288.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

289.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Rhode Island indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

290.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Indirect Purchaser Class.

291.     Defendants were enriched by their illegal activities at the expense of Rhode Island indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Rhode Island indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: South Carolina

292.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

293. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including South Carolina indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

294. Defendants were enriched by their illegal activities at the expense of South Carolina indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of South Carolina indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

## Unjust Enrichment: South Dakota

295. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

296. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including South Dakota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

297. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members.

298. Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

299. Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: Tennessee

300.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

301.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Tennessee indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

302.     Defendants were aware of or appreciated the benefits bestowed upon them by Plaintiffs and Class Members.

303.     Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

304.     It would be futile for Plaintiffs and Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased SENSIPAR AND/OR ITS AB RATED GENERICS, as those intermediaries are not liable and would not compensate Plaintiffs and the Indirect Purchaser Class members for Defendants' unlawful conduct.

## Unjust Enrichment: Utah

305.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

306. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Utah indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

307. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

308. Defendants were enriched by their illegal activities at the expense of Utah indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Utah indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

<b>Unjust Enrichment: Vermont</b>

309. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

310. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Vermont indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

311. Defendants accepted the benefit bestowed upon them by Plaintiffs and Class Members

312. Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it

would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: West Virginia

313. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

314. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including West Virginia indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

315. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

316. Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

### Unjust Enrichment: Wisconsin

317. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for SENSIPAR AND/OR ITS AB RATED GENERICS is a direct and proximate result of Defendants' unlawful practices.

318. The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Wisconsin indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

319. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class Members.

320. Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of SENSIPAR AND/OR ITS AB RATED GENERICS and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of SENSIPAR AND/OR ITS AB RATED GENERICS at illegally inflated prices.

321. Defendants have benefited from the monopoly profits on their sales of Sensipar and/or AB-rated bioequivalents resulting from the unlawful and inequitable acts alleged in this Complaint.

322. Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Sensipar and AB-rated bioequivalents by Plaintiffs and members of the Class.

323. Plaintiffs and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiffs and the Class.

324. It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they had a privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and the Class.

325. It would be futile for Plaintiffs and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased Sensipar, as they are not liable and would not compensate Plaintiffs for unlawful conduct caused by Defendants.

326. The economic benefit of overcharges and unlawful monopoly profits derived by the Defendants through charging supracompetitive and artificially inflated prices for Sensipar are a direct and proximate result of Defendants' unlawful practices.

327. The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Class, as Plaintiffs and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

328. It would be inequitable under the laws of all states and jurisdictions within the United States for the Defendants to be permitted to retain any of the overcharges for Sensipar and/or AB-rated bioequivalents derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

329. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds received by them.

330. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiffs and the Class.

331. Plaintiffs and the Class have no adequate remedy at law.

## COUNT V

**CLAIM FOR INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**
(Against All Defendants)

332. Plaintiffs incorporate by reference the preceding allegations and paragraphs.

333. Plaintiffs brings this case under Section 16 of the Clayton Act (15 U.S.C. § 26) on behalf of itself and the Class.

334. Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to block and delay entry of competing Sensipar formulations,

i.e., AB-rated generic versions of Sensipar. The intended and accomplished goal of the scheme was to maintain Amgen's monopoly power using restrictive and exclusionary conduct to delay the entry of generic Sensipar products. Defendants injured Plaintiffs and the Class through, inter alia, and agreements to exclude generic Sensipar product from the market in exchange for cash payments and royalties on the brand Sensipar product.

335.     Amgen repeatedly asserted that the generic Sensipar formulations of its competitors infringed its patents, despite knowing that the Sensipar patents were invalid and/or unenforceable.

336.     It was the Defendants' conscious objective to further Amgen's monopoly in the relevant market through the overarching anticompetitive scheme. Defendants conspire to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to Sensipar in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiffs and members of the Class paid artificially inflated prices.

337.     Had manufacturers of generic Sensipar products entered the market and lawfully competed with Amgen in a timely fashion, Plaintiffs and other members of the Class would have substituted lower-priced generic Sensipar products for the higher-priced brand-name Sensipar for some or all of their Sensipar product requirements, and/or would have paid lower net prices on their remaining Sensipar and/or AB-rated bioequivalent purchases.

338.     Defendants intended, and accomplished, a horizontal market allocation of the Sensipar market, a *per se* violation of Section 1 of the Sherman Act. By their Agreement, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiffs and members of the Class paid artificially inflated prices for their Sensipar requirements

339. Plaintiffs and members of the Class purchased substantial amounts of Sensipar indirectly from Amgen and/or other manufacturers.

340. Plaintiffs and the Class, pursuant to Fed. R. Civ. P. 57 and 18 U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

341. Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not reoccur in the future.

## DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiffs, on behalf of themselves and the End-Payor Class, demand judgment for the following relief:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and declare the Plaintiffs representative of the End-Payor Class.

B. Declare that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act, of the other statutes set forth above, and of the common law of unjust enrichment under the laws of all states and jurisdictions within the United States;

C. Enjoin Defendants from continuing the illegal activities alleged herein;

D. Enter joint and several judgments against Defendants in favor of Plaintiffs and the End-Payor Class;

E. Grant Plaintiffs and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F. Award the End-Payor Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

G.    Award Plaintiffs and the End-Payor Class their costs of suit, including reasonable attorneys' fees as provided for by law; and

H.    Grant such other further relief as is necessary to correct for the anticompetitive market effort caused by the unlawful conduct of Defendants, and as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: March 14, 2019

**LITE DEPALMA & GREENBERG, LLC**

By:    */s/ Joseph J. DePalma*
Joseph J. DePalma
Bruce D. Greenberg
570 Broad Street - Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Email: jdepalma@litedepalma.com
        bgreenberg@litedepalma.com

Brian P. Murray
Lee Albert
Gregory B. Linkh
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
Email: bmurray@glancylaw.com
        lalbert@glancylaw.com
        glinkh@glancylaw.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Email: mmiller@millerlawllc.com
        lfanning@millerlawllc.com

***Attorneys for Teamsters Local 237 Welfare Fund
and Teamsters Local 237 Retirees' Benefit Fund***

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that to the best of my knowledge, the matter in controversy is the subject of any other actions pending another court: *UFCW Local 1500 Welfare Fund v. Amgen Inc., et al.*, 19cv369 (D. Del.) and *Cesar Castillo, Inc. v. Amgen, Inc., et al.*, 19cv396 (D. Del.).

I certify that to the best of my knowledge, the matter in controversy is not the subject of any arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of March, 2019.

LITE DEPALMA & GREENBERG LLC

By:    */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street - Suite 1201
Newark, New Jersey 07102
Tel: 973.623.3000
Email: jdepalma@litedepalma.com
